Filed 11/21/13 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of BECKY and GARY BURWELL. | |
| BECKY BURWELL, | F064265 |
| Movant and Appellant, | (Kern Sup. Ct. No. S1501-FL-591767) |
| v. | |
| CYNTHIA BURWELL, | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| Objector and Appellant. | **[NO CHANGE IN JUDGMENT]** |

BY THE COURT:

The opinion herein, certified for partial publication and filed October 31, 2013, is modified as follows:

1.     On page 23, in the first full paragraph after the sentence beginning with "In this scenario…" add the following:

The term life insurance policy at issue here also had a suicide clause whereby the insurer was not obligated to pay the proceeds if the insured committed suicide within two years of the policy date. In a petition for rehearing, Becky contends the reasoning we apply above with respect to premium caps and renewal rights should also apply to the suicide clause. We disagree.

In our discussion of premium caps and renewal rights above, we acknowledge situations where the separate estate may appropriate the community's contractual rights to obtain the policy proceeds. And, when one spouse appropriates a community asset for separate use, he or she must reimburse the community. (*Marriage of Elfmont*, *supra*, 9 Cal.4th at p. 1039 (conc. & dis. opn. of George, J.) Thus, it is the separate estate's appropriation of a community asset (e.g., the renewal right, premium cap) that triggers the duty to reimburse. In contrast to the renewal right, the right to avoid payment of the proceeds in the event of suicide belongs to the insurer, not the community estate. (See Civ. Code § 1458 ["A right arising out of an obligation is the property of the person to whom it is due…"].) Thus, in the context of suicide clauses, the separate estate has not appropriated contractual rights belonging to the community.

2.      On page 24, in the first paragraph after the sentence ending "… because there is an insufficient factual record" add a new footnote 21 with the following language:

> In her petition for rehearing, Becky argues that even under the test we announce in this opinion, there was substantial evidence the proceeds were entirely community property. Specifically, she contends there was substantial evidence Gary paid the final premium payment with community funds. We disagree.
>
> " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.] 'Substantial evidence … is not synonymous with 'any' evidence.' … Speculation or conjecture alone is not substantial evidence." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) Becky points to her declaration as substantial evidence that Gary paid the final premium payment on the policy with community funds, including the following quotation: "All premiums paid on the Reassure America Policy came either from the community property earnings of BCI or from the $2,800,000 of community property funds Mr. Burwell removed from BCI without my knowledge or consent." The disjunctive wording of this statement implies what the very next sentence confirms: Becky did not know whether the funds Gary used to pay the premiums were community property. The next sentence of the declaration reads: "*If* Mr. Burwell commingled the $2,800,000 he misappropriated with his other earnings, the *presumption* is and must be that the community property in his possession was used to pay the community property premiums." (Italics added.)

2.

Becky's speculation that Gary might have commingled funds and her presumption he used those commingled funds to pay the premiums is not substantial evidence.  On remand, Becky is free to produce any reasonable, credible, solid evidence that Gary paid the premiums with community property.  She has not yet done so.

3.  Subsequent footnotes are to be renumbered accordingly.

This modification does not affect the judgment.  The petition for rehearing is denied.

                                     _____
                                       Poochigian, Acting P.J.

WE CONCUR:

_____
Franson, J.

_____
Peña, J.

Filed 10/31/13 (unmodified version)

CERTIFIED FOR PARTIAL FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of BECKY and GARY BURWELL. | |
| BECKY BURWELL,<br><br>Movant and Appellant,<br><br>v.<br><br>CYNTHIA BURWELL,<br><br>Objector and Appellant. | F064265<br><br>(Kern Sup. Ct. No. S1501-FL-591767)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Susan M. Gill, Judge.

Bowman and Associates, Stacy H. Bowman; Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, Catherine E. Bennett, and Thomas V. DeNatale, Jr., for Objector and Appellant.

Stephen Temko for Movant and Appellant.

-ooOoo-

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III through IX of the Discussion.

## INTRODUCTION

Are the proceeds of a term life policy community property or separate property of the spouse who pays the final premium? Our answer is an all too familiar one: it depends. We hold that the characterization "will depend on the … premium for the final term of the policy." (*Minnesota Mut. Life Ins. Co. v. Ensley* (9th Cir. 1999) 174 F.3d 977, 983 (*Minnesota Mut. Life Ins. Co.*).) The effect of the rules governing characterization of term life insurance proceeds depends on multiple factors, including whether the policy contains certain contractual provisions, and the insurability of the insured spouse. The result is an unfortunately intricate methodology for allocating proceeds of term life insurance policies. Were we free to abandon community property jurisprudence and craft a simpler holding we might do so. We are not.

Here, the trial court failed to make findings sufficient to determine proper characterization of the proceeds. Therefore, we vacate the court's order, and remand for further factual findings and application of the rules we set forth herein.[1]

## FACTS

In 1996, during the marriage of Becky J. Burwell[2] and Gary J. Burwell, a term life insurance policy was purchased (hereafter the "term life policy" or "the policy.") Gary was the insured and Becky was the named beneficiary until October 7, 2008.

In September 2004, Becky petitioned for dissolution of her marriage with Gary.

*Automatic Temporary Restraining Orders*

Gary was served with a summons along with Becky's petition. The summons contained a number of automatic temporary restraining orders (ATROs). (See Fam.

---

[1] The parties' remaining contentions do not alter this disposition. We discuss those contentions in the unpublished portion of our Discussion in parts III through IX.

[2] Because Becky, Gary and Cynthia Burwell are referenced in the record at one point or another by the same last name, we use their first names for clarity.

Code, § 2040; Cal. Rules of Court, rule 5.50(b).)  The ATROs included the following text:

"Starting immediately, you and your spouse are restrained from:  [¶] … [¶]

"2.     cashing, borrowing against, cancelling, transferring, disposing of, or changing the beneficiaries of any insurance or other coverage including life, health, automobile, and disability held for the benefit of the parties and their minor child or children;

"3.     transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life; and

"4.     creating a nonprobate transfer or modifying a nonprobate transfer in a manner that affects the disposition of property subject to the transfer, without the written consent of the other party or order of the court.  Before revocation of a nonprobate transfer can take effect, or a right of survivorship to property can be eliminated, notice of the change must be filed and served on the other party."

*Gary Remarries*

A status-only judgment of dissolution was entered in August 2005, and the court retained jurisdiction over all other issues.  In November 2006, [3] Gary married Cynthia Burwell (Cynthia).

*August 2008 Stipulated Judgment*

In August 2008, Gary and Becky stipulated to a "further" judgment resolving some property issues.  Though the stipulated judgment indicates that "the parties have reached an agreement with regard to the division of their marital property," five issues were explicitly reserved for a trial.  One of the issues reserved for trial was "claims for breach of spousal fiduciary duty."

---

[3] Both parties agree in their briefs that Gary married Cynthia in November 2006.

The stipulated judgment, signed by both parties, also states:

> "16. <u>Full Disclosure of Assets and Gifts.</u> Each party has warranted to the other that he or she has no ownership interest in or claim to any property of any kind, other than the property described in this Further Judgment, and that he or she has not made, without the knowledge of the other, any gift or transfer of community property within the past five years for less than full and adequate consideration.

> "17. <u>After-Discovered And Concealed Assets</u>. If additional assets of a community property nature are subsequently discovered, the existence of which were in good faith unknown or forgotten by both parties, such assets shall be divided equally between the parties. All other after-discovered assets shall be divided as determined by a court of competent jurisdiction. This court specifically retains jurisdiction over all concealed or after-discovered assets."

The judgment also fixed the separation date at September 21, 2004.

### Change of Beneficiary

On October 7, 2008, Gary changed the beneficiary on the term life policy from Becky to Cynthia. Gary had not listed the policy in his preliminary or final disclosure declarations in the dissolution action. (See Fam. Code, §§ 2104, 2105.)

### Trial on Reserved Issues

The trial on reserved issues contemplated by the prior stipulated judgment commenced in June 2009 before Judge John Somers and continued over several months. Several issues were adjudicated at the trial. The most contentious issue involved a community-asset business called Burwell Concrete, Inc. (BCI). The court was tasked with deciding whether approximately $2.5 million in postseparation income from BCI was community income or Gary's separate income. The trial also dealt with claims of breach of fiduciary duty.

The court eventually issued its ruling on May 16, 2011. First, the court ruled that (1) BCI had been awarded to Gary on August 21, 2008, and (2) postseparation income from BCI prior to August 21, 2008, was community income.

4.

The court then ruled on the breach of fiduciary duty claims as follows:

"[T]he court does not find a breach of fiduciary obligation in this case. There is no evidence that petitioner failed to meet her obligations of disclosure, or of good faith and fair dealing, in any way. Respondent's [i.e., Gary's] conduct is more problematic. Despite counsel's best efforts, there were often significant delays or problems in the disclosure of relevant financial information…. The disclosure issues, while problematic, are not sufficient in the court's view to establish breach of a fiduciary obligation in this case."

The court also ruled that Gary owed Becky (1) $105,195.49 in "back [spousal] support payments and interest"; (2) $125,000 in attorney fees; (3) $1,524,531 in reimbursements and credits for Becky's portion of community property less $44,283.14 in Gary's reimbursements; and (4) $95,102 in previously ordered equalization payments.

### *Gary's Suicide and Becky's Civil and Probate Actions*

In April 17, 2010, after trial had commenced, but before the court had issued its aforementioned ruling, Gary committed suicide. Shortly after Gary's death, Becky filed a civil action to prevent the term life policy's proceeds from going to Cynthia. Becky also filed a probate action seeking letters of administration for Gary's estate.

Becky moved to consolidate the civil action with the dissolution proceeding. Cynthia opposed consolidation. In her opposition papers, Cynthia argued that there were "no remaining issues left to be determined in the family law matter." Her opposition papers further stated that she "is not a party to the action nor does she have any real interest in the outcome." The court denied the motion to consolidate, but ordered the civil action stayed.

### *Becky's Motion Regarding the Insurance Policy*

Concurrent with her motion to consolidate, Becky filed a motion seeking adjudication of the insurance policy as an omitted asset. (See Fam. Code, § 2556.) Becky contended that she was entitled to 100 percent of the proceeds. She acknowledged

that she was aware of the policy when it was purchased, but assumed Gary had let it lapse.

Becky argued she was entitled to the proceeds under three legal theories. First, Gary's purported change of beneficiary from Becky to Cynthia was void because it was made in violation of the ATROs. As a result, Becky was still the operative beneficiary under the policy. Second, Gary's failure to disclose the insurance policy in his disclosures violated Family Code section 1101, and therefore the proceeds should be awarded entirely to Becky under subdivision (h) of that section. Third, the court retained jurisdiction over omitted community property assets under the August 2008 stipulated judgment. She argued she was entitled to half the proceeds as her share of the community asset. She also claimed the other half of the proceeds because they exceeded the amount of debt Gary owed her. These included amounts Gary allegedly owed her under the August 2008 stipulated judgment and "anticipated amounts [Gary] will owe [Becky] once Judge Somers makes his ruling [after the trial on reserved issues]." Becky subsequently filed a "Supplemental Memorandum of Points and Authorities" raising a fourth theory of recovery. In that filing, Becky argued that Gary's purported change of beneficiary must be set aside as a fraudulent transfer under section 3439.04 of the Civil Code.

Cynthia filed briefing in opposition to the motion and her counsel appeared at oral argument. She contended that the policy was Gary's separate property. She also argued that to the extent the ATROs apply to separate property, they conflict with Family Code section 2010. Cynthia contended that section 2010 provides that "the court has no jurisdiction over a spouse[']s separate property."

*Court's November 9, 2011, Order*

Judge Susan M. Gill ruled on the motion in an order dated November 9, 2011. [4]  It is from this order that both parties appeal.

The court found that Gary failed to disclose the policy and thereby violated his fiduciary duty to Becky.  As a result, the policy was deemed an omitted asset and was "neither distributed in the Judgment on Reserved Issues, nor included in Judge Somers' ruling of April 1, 2010."  Therefore, the ATROs continued to apply to the asset, and Gary's change of beneficiary to Cynthia "is void."

The court ruled that the policy was a community asset.  The ruling contained no analysis of the characterization issue, but did cite to *Estate of Logan* (1987) 191 Cal.App.3d 319, 326 (*Logan*) and *In re Marriage of Gonzalez* (1985) 168 Cal.App.3d 1021, 1024-1026.

The court ordered one-half of the $1 million proceeds distributed to Becky "as her share of this community property asset."  The court ordered that the remaining half of the proceeds "shall become part of [Gary's] estate."  The order notes that Becky is a creditor of the estate "and the Probate Court must resolve the issue of what priority to give [Becky's] creditor claims against [Gary's] estate."

*Postruling Filings Below*

Cynthia filed a notice of intent to move for a new trial, seeking an order "(1) setting aside the ruling signed on November 7, 2011, that awards one-half of the term life insurance proceeds to Becky [] and (2) granting [a] new trial."  (See fn. 6, *post*.)

Cynthia also filed a notice of appeal from the November 9, 2011, order.  Becky filed a notice of cross-appeal from the same order.

---

[4] The minute order cover sheet on the court's letterhead is dated November 9, 2011.  The attached ruling was on pleading paper and was dated November 7, 2011.

*Motions Filed on Appeal*

Cynthia filed a motion to augment the appellate record with an October 22, 2009, transcript of testimony from the trial on reserved issues. Becky opposed the motion to augment and requested that we strike certain portions of Cynthia's opening brief referencing the transcript and certain portions of appellant's appendix, volume II. Becky contends these documents pertained to the trial on reserved issues before Judge Somers and were not before Judge Gill when she issued the appealed order. We granted the motion to augment the record, but did not "resolve the transcript's relevance to any issue on appeal or whether the court will consider the reporter's transcript on review." We previously deferred ruling on Becky's motion to strike pending further order of this court. We now deny it.[5] (See *People v. Preslie*, *supra*, 70 Cal.App.3d at pp. 490-491.)

Becky moved this court to dismiss Cynthia's appeal for lack of standing. We previously deferred ruling on the dismissal motion. For the reasons explained below, we now deny that motion as well.

---

[5] Becky moved to strike portions of Cynthia's opening brief that refer to exhibits Nos. 22, 22a, 23, 24 and 25 of appellant's appendix, and the October 22, 2009, reporter's transcript. She contends the exhibits and transcript are "not properly before" this court because they were not "before" Judge Gill when she issued the appealed order. Rather, they had been lodged earlier in the case during the trial on reserved issues before Judge Somers.

The exhibits are properly before us. We may augment the record to include "[*a*]*ny* document filed or lodged *in the case* in superior court .…" (Cal. Rules of Court, rule 8.155(a)(1)(A), italics added.) "By the explicit terms of the rule it is not a prerequisite to augmentation that the requested documents be offered or used on the trial or hearing below." (*People v. Preslie* (1977) 70 Cal.App.3d 486, 490.) Becky's motion to strike portions of appellant's appendix and opening brief is denied.

# DISCUSSION

## I.

## CYNTHIA IS A "PARTY" FOR PURPOSES OF APPELLATE STANDING

In California, the right to appeal civil actions is statutory. (*Jordan v. Malone* (1992) 5 Cal.App.4th 18, 21.) In order to exercise that statutory right, an appellant must have standing. (*Ibid.*)

Appellate standing is conferred by section 902 of the Code of Civil Procedure. (*Rao v. Campo* (1991) 233 Cal.App.3d 1557; see Code Civ. Proc., § 902.) That statute provides, in relevant part, that "[a]ny party aggrieved may appeal …." (Code Civ. Proc., § 902.) By its plain language, Code of Civil Procedure section 902 limits appellate standing in two important ways. To have appellate standing, one must (1) be a party and (2) be aggrieved. (*Ibid.*; see also *Conservatorship of Gregory D.* (2013) 214 Cal.App.4th 62, 67.)

In her motion to dismiss, Becky argues Cynthia was not a "party" to the action below and therefore lacks standing. She does not contend Cynthia was not "aggrieved" by the order from which she ostensibly appeals.

The general rule is that "only a party of record to the proceedings in the trial court may appeal." (*Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126, 131, fn. 5.) But, a party of record includes " 'one who takes appropriate steps to become a party of record in the proceedings.' " (*In re Silvia R.* (2008) 159 Cal.App.4th 337, 345, fn. 3.) For example, when a person or entity moves to vacate a judgment pursuant to Code of Civil Procedure section 663, they become a "party" for purposes of appellate standing. (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736 (*Carleson*).)

The California Supreme Court held in *Carleson* that "one who is legally 'aggrieved' by a judgment may become a party of record and obtain a right to appeal by moving to vacate the judgment pursuant to Code of Civil Procedure, section 663." (*Carleson*, *supra*, 5 Cal.3d at p. 736.) As Becky argues in her motion, "Cynthia did not

9.

move to vacate the judgment under Code of Civil Procedure section 663." But, Cynthia did file a motion seeking to "set aside" the subject order under Code of Civil Procedure section 657. [6] Thus, if the *Carleson* rule applies to any motion to vacate or set aside an order and is not limited to motions brought under Code of Civil Procedure section 663, then Cynthia would be a party of record for purposes of appellate standing. In accordance with the general rule that doubts as to standing are resolved in favor of the right to appeal (*Apple*, *Inc. v. Franchise Tax Bd.* (2011) 199 Cal.App.4th 1, 13), we hold that the *Carleson* rule does apply here.

For the reasons explained below, we view the Supreme Court's reference to Code of Civil Procedure section 663 in *Carleson* (*Carleson*, *supra*, 5 Cal.3d 730) as merely identifying one type of motion to vacate that will confer "party" status on the movant for purposes of appellate standing. In this context, we see no relevant distinction between a

---

[6] On its own motion, this court has augmented the record to include Cynthia's notice of intent to move for a new trial. (See Cal. Rules of Court, rules 8.155(a)(1)(A), 8.124(b)(1)(A), 8.122(b)(1)(D).) We notified the parties of our intent to augment the record in this manner and permitted the filing of objections. Becky (through counsel) filed a letter indicating that she did not have an objection to the augmentation. But, she advised this court of additional proceedings regarding the motion for new trial. The letter and its attachments indicate that after filing the notice of intent, Cynthia requested an extension of time to "file a Motion for New Trial." The letter and its attachments further indicate that the court denied the request for an order extending time and that "no Motion for New Trial was ever filed." Even if we were to consider this information, it is not relevant for purposes of determining standing.

The notice of intention to move for a new trial is itself the motion for a new trial. (Code Civ. Proc., § 659, subd. (b).) Cynthia very well may have failed to file a memorandum of points and authorities or supporting affidavits or some other documents to support the motion. And, if true, that failure alone could have been grounds for denial. (See Cal. Rules of Court, rule 3.1600(b).) But for purposes of standing, we are concerned with whether Cynthia made the subject motion, not whether it was successful. That is, we are determining whether Cynthia took " 'appropriate steps to become a party of record in the proceedings' " (*In re Silvia R.*, *supra*, 159 Cal.App.4th at p. 345, fn. 3) not whether those efforts were meritorious.

10.

motion seeking to set aside a decree (Code Civ. Proc., § 663) and a motion seeking to "vacate[]" a "decision" (Code Civ. Proc., § 657). Thus, we believe the most faithful application of *Carleson* would permit an appeal here, where the appellant moved to set aside the judgment in the lower court.

In support of its holding in *Carleson*, the Supreme Court cited to five cases: *Eggert v. Pac. States S. & L. Co.* (1942) 20 Cal.2d 199, 201 (*Eggert*); *In re Elliott* (1904) 144 Cal. 501 (*Elliott*); *In re Estate of Partridge* (1968) 261 Cal.App.2d 58 (*Estate of Partridge*); *In re Estate of Sloan* (1963) 222 Cal.App.2d 283 (*Estate of Sloan*); and *Butterfield v. Tietz* (1966) 247 Cal.App.2d 483 (*Butterfield*). (*Carleson*, *supra*, 5 Cal.3d at pp. 736-737.)

In all of these cases, there was no indication that a person must file a motion seeking to vacate the judgment under a particular statute. To the contrary, in *Estate of Sloan*, the court described *Eggert* and other cases as holding that a party must "move to vacate *or otherwise formally oppose* the judgment appealed from below." (*Estate of Sloan*, *supra*, 222 Cal.App.2d at p. 292, italics added.) Likewise, the remainder of the cases do not require the motion to vacate be made pursuant to any particular statute.[7]

Thus, we view *Carleson*'s reference to Code of Civil Procedure section 663 as merely identifying the statute under which that case's particular motion was brought. We do not view the statutory citation as limiting the scope of *Carleson*'s holding. (*Carleson*, *supra*, 5 Cal.3d 730.)

---

[7] See *Eggert*, *supra*, 20 Cal.2d at page 201 (holding appellants lacked standing, and noting they had ample opportunity "to become parties of record by moving to vacate the orders to which they objected"); *Elliott*, *supra*, 144 Cal. at pages 509-510 (a person can "make himself a party by moving to set aside such judgment or order"); *Estate of Partridge*, *supra*, 261 Cal.App.2d at pages 60-61 ("proper procedure" was to "move to set aside *or* vacate such order" (italics added.); *Butterfield*, *supra*, 247 Cal.App.2d at pages 484-485 ("Ordinarily, if an appellant is not a party of record at the time of judgment or order from which appeal is taken, an appeal is not in order without first filing a motion to vacate the adverse ruling").

The Fourth District arrived at a similar conclusion in *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336 (*Hughes Aircraft*). The Court of Appeal applied the *Carleson* rule where the appellant had moved for a judgment notwithstanding the verdict and for a new trial. (*Hughes Aircraft*, *supra*, 83 Cal.App.4th at pp. 1342-1343.) In *Hughes Aircraft*, the appellant's motions challenging the judgment below were brought under Code of Civil Procedures sections 629 and 657, not Code of Civil Procedure section 663. (*Hughes Aircraft*, *supra*, at pp. 1342-1343.) Nonetheless, the court held that motions for judgment notwithstanding the verdict and a new trial are similar to the Code of Civil Procedure section 663 motion in *Carleson*, in that they "ask the trial judge to vacate a verdict or judgment and enter a new one." (*Hughes Aircraft*, *supra*, at p. 1343.) We agree with this approach, where reviewing courts determine the applicability of the *Carleson* rule by looking to the nature of the underlying motion, not its statutory basis. (*Carleson*, *supra*, 5 Cal.3d 730.)

Here, Cynthia's motion sought to "set[] aside the ruling signed November 7, 2011 ...," and was therefore a motion seeking to vacate the order for purposes of the *Carleson* rule. Contrary to Becky's contention in her motion to dismiss, Cynthia is a "party" for purposes of appellate standing. (See *Carleson*, *supra*, 5 Cal.3d at pp. 736-737.) [8]

Next, we address the characterization of term life insurance proceeds.

## II.

## THE POLICY PROCEEDS CANNOT BE CHARACTERIZED ON THIS FACTUAL RECORD

Unless otherwise provided by statute, all property acquired during marriage while domiciled in California is community property. (Fam. Code, § 760.) One category of separate property is the "earnings and accumulations of a spouse … while living separate

---

[8] Becky's motion to dismiss the appeal is denied.

12.

and apart from the other spouse, are the separate property of the spouse." (Fam. Code, § 771, subd. (a).) But, "property *attributable* to community earnings must be divided equally when the community is dissolved." (*In re Marriage of Brown* (1976) 15 Cal.3d 838, 847-848 (*Marriage of Brown*), italics added.)

Here, we must apply these principles to term life insurance proceeds.

"Term life insurance policies typically contain two elements, dollar coverage payable in the event of death and a right to renewal for future terms without proof of current medical eligibility." (*Logan*, *supra*, 191 Cal.App.3d at p. 324.) "At the expiration of the term of years, the policy expires without retaining cash value." (*Ibid*.)

There is a split of authority in California regarding the characterization of term life insurance proceeds as community or separate property. (See *In re Marriage of Spengler* (1992) 5 Cal.App.4th 288, 292-293 (*Marriage of Spengler*).) On one side is *Logan*, *supra*, 191 Cal.App.3d at page 325.

### Logan decision

In *Logan*, the First District held that term life insurance policies only remain community property after separation for as long as community funds are used to pay the premium. (*Logan*, *supra* 191 Cal.App.3d at p. 325.) Otherwise, if the insured remains insurable, the term policy is not a divisible community asset because "the policy is of no value and the community has fully received what it bargained for." (*Id*. at pp. 325-326.) In dictum, *Logan* indicated that "[i]f the insured becomes uninsurable during the term paid with community funds, then the right to future insurance coverage which cannot otherwise be purchased is a community asset to be divided upon dissolution." (*Id*. at p. 325.) In *Marriage of Spengler*, *supra*, 5 Cal.App.4th 288, the Third District agreed

with the holding of *Logan* but disagreed with its dictum.  (*Marriage of Spengler*, *supra*, at p. 293.)[9]

### Biltoft and Woodmen decisions

Conversely, in *Biltoft v. Wootten* (1979) 96 Cal.App.3d 58 (*Biltoft*), the Fourth District held that proceeds from term life insurance "must be apportioned between community and separate property in the same ratio that the amount of premiums paid from community earnings bears to the amount of premiums paid from separate property." (*Id.* at p. 62.)  It rejected the notion "that no person has an interest in a term life insurance policy beyond the date the premium is due .…" (*Id.* at p. 61.)  It disagreed with the argument that "each premium payment is a new contract," citing *Modern Woodmen of America v. Gray* (1931) 113 Cal.App. 729 (*Modern Woodmen*).  (*Biltoft*, *supra*, at p. 61.)

With a few exceptions, we agree with *Logan.*  The coverage and premium provisions of term life insurance policies "provide[] dollar coverage only for the specific term for which the premium was paid." (*Logan*, *supra*, 191 Cal.App.3d at p. 324.)  Therefore, the characterization of the proceeds "will depend on the … premium for the

---

[9] Two Court of Appeal cases deal with a different issue:  the valuation of a term life policy at the time of dissolution while the insured spouse is still alive.  (*In re Marriage of Lorenz* (1983) 146 Cal.App.3d 464, 466-468; *In re Marriage of Gonzalez*, *supra*, 168 Cal.App.3d at p. 1025.)  The Second District held a term life insurance policy was not divisible community property because it was "worthless" until its benefits were payable.  (*In re Marriage of Lorenz*, *supra*, 146 Cal.App.3d at pp. 466-468.)  The Fourth District held term life insurance policies may have replacement value when the " 'insurability of the insured is lessened because of advancing age or declining health, and the existing policy cannot be cancelled or contains a guaranty of insurability.' " (*In re Marriage of Gonzalez*, *supra*, 168 Cal.App.3d at p. 1025.)  These cases are not directly on point.  (See *In re Marriage of Havins* (1996) 43 Cal.App.4th 414, 419, fn. 3.)  Here, we are dealing with "the division of proceeds of the policy upon death," not the division of the policy while the insured is still alive.  (See *ibid.*) This distinction is important, as explained below.  (See fn. 12, *post.*)

final term of the policy." (*Minnesota Mut. Life Ins. Co.*, *supra*, 174 F.3d at p. 983.)[10] When the final premium is paid solely with community property, "the proceeds of the policy are community property." (*Logan*, *supra*, 191 Cal.App.3d at p 321.) Conversely, when the separate estate pays for the final premium with no help from the community, the proceeds are a separate asset. (*Id.* at pp. 321, 325.)

We believe *Biltoft* and *Woodmen* err in analyzing the relevant property interests at the wrong level of abstraction. That is, those opinions generally identify the property interest as the entire insurance policy. We believe the proper unit of analysis is the individual contractual rights conferred by the policy. As was said in an analogous context, "[t]he Court of Appeal's … analysis rests on the erroneous legal assumption that [the asset] was … unitary and indivisible …. It is not." (*In re Marriage of Sonne* (2010) 48 Cal.4th 118, 127.)[11] Similarly, a term life insurance policy is not a unitary and indivisible asset giving rise to a unitary and indivisible property interest. Rather, the relevant property interests are the individual enforceable contractual rights derived from the policy. (See Civ. Code, § 953; cf. *Marriage of Brown*, *supra*, 15 Cal.3d at p. 845 ["a contractual right is … a chose in action, a form of property (see Civ. Code, § 953)"].)

"An insurance policy is a contract between an insurer and an insured …, the insurer making promises, and the insured paying premiums, the one in consideration for the other, against the risk of loss …." (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 44-

---

[10] In its characterization of the term life proceeds at issue, *Minnesota Mut. Life Ins. Co.*, *supra*, 174 F.3d 977 relied heavily on *Logan*. (*Minnesota Mut. Life Ins. Co.*, *supra*, 174 F.3d at p. 983.) However, the case distinguishes *Logan*'s medical uninsurability exception. (*Minnesota Mutual Life Ins. Co.*, *supra*, at pp. 983-984.)

[11] In *Marriage of Brown*, *supra*, 15 Cal.3d 838, our Supreme Court held that the contractual right to receive pension payments was a form of property for dissolution purposes. *Marriage of Brown* held "the employee's right to [pension] benefits is a contractual right, *derived* from the terms of the employment contract. [This] *contractual right* is … a form of property (see Civ. Code, § 953; [citation.])." (*Id.* at p. 845, italics added.)

45, citations omitted.) One of the insurer's promises in a term life policy is the agreement to pay the policy proceeds if the insured dies between dates x and y. The payment of the subsequent premium is consideration for another promise from the insurer: to pay the proceeds if the insured dies between dates y to z. In other words, the " 'premium is the amount paid for … a *certain period* of coverage.' " (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1324, italics added.)

Each premium payment gives rise to an enforceable contractual right of coverage for an additional period of time. As premiums are paid over the life of the policy, distinct property interests in coverage for various periods of time arise. Of those distinct property interests, only one is worth anything in hindsight: coverage for the term during which the insured dies.[12] Thus, the relevant inquiry is who obtained the specific contractual right to coverage for the *final* term,[13] and how. (*Minnesota Mut. Life Ins. Co.*, *supra*, 174 F.3d at p. 983 [characterization of proceeds "will depend on the … premium for the final term of the policy"].)

---

[12] Prior terms of coverage only lack value in hindsight (i.e., when it is certain the contingency has failed). Prospectively, all coverage terms have at least expected value. (But cf. *In re Marriage of Lorenz*, *supra*, 146 Cal.App.3d 464.) That is why it is important to maintain a distinction between cases involving the characterization of a term life policy while the insured is still alive (e.g., *In re Marriage of Lorenz*, *supra*, 146 Cal.App.3d 464; *In re Marriage of Gonzalez*, *supra*, 168 Cal.App.3d 1021), and cases involving the characterization of term life policy *proceeds* after the insured has died (e.g, *Logan*, *supra*, 191 Cal.App.3d 319; *Biltoft*, *supra*, 96 Cal.App.3d 58). (See *In re Marriage of Havins*, *supra*, 43 Cal.App.4th at p. 419, fn. 3.)

[13] Our use of the phrases "final term" or "final coverage term" refers to the term during which the insured dies. We refer to the corresponding premium as the "final premium payment" or "final premium." We recognize that when the insured does not die during the entire term of the overall policy, then even the final term has no substantive value. But that is not the situation here, so our use of these phrases presumes that the insured has died during a term of the policy.

As we will explain, *Biltoft* and *Woodmen*'s misidentification of the relevant property interests leads to their erroneous characterization of the proceeds and the needless deaths of countless straw men.

*Biltoft* and *Woodmen* first reject the argument that each premium payment does not create a new contract. They are correct to discredit this notion. The relevant "property" is not a unitary and indivisible interest in the entire policy contract, but in the individual enforceable contractual rights derived from it. (See Civ. Code, § 953; cf. *Marriage of Brown*, *supra*, 15 Cal.3d at p. 845 ["a contractual right is … a chose in action, a form of property (see Civ. Code, § 953)"].) While each premium payment does not create a new contract, it does give rise to a new enforceable contractual right and thus a distinct property interest. By way of analogy, consider a one-year apartment lease. Each rent payment does not create a new lease, but paying January's rent does not entitle a tenant to live there in October. [14]

*Biltoft* and *Woodmen* next assert "it would be unreasonable to hold that the payment of the premiums … would convert the entire proceeds .…" (*Biltoft*, *supra*, 96 Cal.App.3d at p. 61; *Woodmen*, *supra*, 113 Cal.App. at p. 732.) This is true, as far as it goes. The separate estate's subsequent payment of the premium does not "convert" the community's "proceeds." But the point is they were never the community's proceeds to begin with. The proceeds belong to whomever the insurance company is contractually obligated to pay. In other words, the valuable property interest is the enforceable

---

[14] The rationale of *Biltoft* and *Woodmen* does lend itself well to other contexts where the community pays into an asset that retains cash value. For example, whole life insurance policies "provide both insurance *and cash value accumulation*." (*Chabner v. United of Omaha Life Ins. Co.* (9th Cir. 2000) 225 F.3d 1042, 1045, fn. 1, italics added.) In that situation, the community is paying for dollar protection against a contingency *and the right to a portion of the policy's cash value accumulation*. In that way, a whole life policy is more akin to a home mortgage than an apartment lease.

contractual right to compel payment of the proceeds.  (See Civ. Code, § 953; cf. *Marriage of Brown*, *supra*, 15 Cal.3d at p. 845 ["a contractual right is … a chose in action, a form of property (see Civ. Code, § 953)"].)  In this context, that contractual right is the coverage during which the insured dies.  The community did not acquire this contractual right.  Instead, the community paid for, and received in full, a different contractual right:  the right to be paid upon a contingency that ultimately failed.  The important aspect of this contractual right is not that it has been converted or appropriated by the separate estate (it has not).  The pivotal attribute of the community's interest is its complete lack of value.  It does not entitle its holder to the policy proceeds and never will.  The right to be paid if the insured dies between January 1 and 31 becomes forever worthless on February 1 if the insured is alive.  That is how term insurance works.

Even *Logan* briefly falls prey to this erroneous "conversion theory."  *Logan* states:  "If, as is usually the case, the insured is insurable at the end of the term purchased with community funds, the renewed policy, that is, the term policy purchased by the payment of the premium with postseparation earnings which are separate property … *changes character from community to separate property*."  (*Logan*, *supra*, 191 Cal.App.3d at pp. 324-325, italics added.)  We disagree.  The reason the community is not entitled to the proceeds is not because contractual rights have changed in character.  It is because the separate and community estates have different contractual rights; one valuable and the other not.  The community has the worthless right to payment upon a contingency that has failed.  The separate estate has the valuable right to payment upon a contingency that has occurred.  The point is "the community has fully received everything it bargained for" (*id.* at p. 325), not that the community's rights have become separate property.

These principles only bring us so far.  It is clear that characterization of the proceeds as separate or community "will depend on the … premium for the final term of the policy."  (*Minnesota Mut. Life Ins. Co.*, *supra*, 174 F.3d at p. 983.)  Complications

arise when the separate estate uses a community asset to acquire the final term of coverage.

"[I]t is … well established that, upon separation of the parties or dissolution of marriage, one spouse is not entitled to appropriate a community asset for his or her own use without reimbursing the community for the value of the appropriated asset." (*In re Marriage of Elfmont* (1995) 9 Cal.4th 1026, 1039 (conc. & dis. opn. of George, J.) (*Marriage of Elfmont*).) The community must be reimbursed to the extent it owns or has an interest in the contractual rights used by the separate estate to obtain the final coverage term. As explained, *post*, this concept is relevant where the insured spouse becomes medically uninsurable during a term paid for by the community.

### *Medical Uninsurability and the Right of Renewal*

A person is medically uninsurable if they are "unable to obtain individual life insurance." (*Spengler*, *supra*, 5 Cal.App.4th at p. 291.) A person may become uninsurable because of the condition of their health. (Cf. *United States v. Ryerson* (1941) 312 U.S. 260, 262.) Sometimes, a person who becomes medically uninsurable may nonetheless continue existing coverage by virtue of a contractual right to renew their policy. (*Marriage of Elfmont*, *supra*, 9 Cal.4th at p. 1034.) This is referred to as the "right of renewal." (*Ibid*.)

The right of renewal is an enforceable contractual right and a property interest. (See Civ. Code, § 953; see also *Marriage of Brown*, *supra*, 15 Cal.3d at p. 845 ["a contractual right is … a chose in action, a form of property (see Civ. Code, § 953)"].) The community initially purchased this right of renewal, and maintained it for a period of time through subsequent premiums. The right of renewal is therefore, at least in part, community property. (Fam. Code, § 760.)

When the insured spouse becomes medically uninsurable during the community's terms of coverage, his or her separate estate can only acquire subsequent terms of coverage by appropriating the community's contractual right to renew. By definition, the

19.

uninsurable spouse would be unable to continue coverage without it.  Thus, the acquisition of the final coverage term is dependent on both the separate estate's payment of premiums *and the community's renewal right*.  Both the separate and community estates are contributing towards the purchase of subsequent coverage terms (including the all-important final coverage term).  The community's contribution is represented by the premiums it has paid over the life of the policy, which are the funds expended to acquire and retain the renewal right.  Once the premiums are paid solely by separate funds, it is the separate estate that is maintaining the renewal right.  Given the joint effort of community and separate assets in acquiring the relevant asset (i.e., the final coverage term), the proceeds obtained therewith must be apportioned.  "[I]t is … well established that, upon separation of the parties or dissolution of marriage, one spouse is not entitled to appropriate a community asset for his or her own use without reimbursing the community for the value of the appropriated asset." (*Marriage of Elfmont*, *supra*, 9 Cal.4th at p. 1039 (conc. & dis. opn. of George, J.).)[15]

This view is consistent with dicta from the Supreme Court's decision in *Marriage of Elfmont*.  In discussing term life insurance, the Supreme Court stated:  "To provide for a former spouse's participation in [the] proceeds, when premium payments from

---

[15] *Marriage of Spengler* is distinguishable on this point.  *Marriage of Spengler* dealt with an "employment-related group term life insurance policy …." (*Marriage of Spengler*, *supra*, 5 Cal.App.4th at p. 290.)  In *Marriage of Spengler*, the court held that the renewal right "was a mere expectancy rather than a contingent property interest" because the right "depended not only on continued employment by husband but also on continued offering of the plan by the employer." (*Id.* at p. 298.)  An expert had testified that "any group term life insurance policy can be terminated by the employer at any time, with 30 days notice." (*Ibid.*)  Thus, "the prospect of renewal of the policy by the employer was a beneficence to which the husband had no enforceable right." (*Id.* at p. 299.)

Here, there is no provision for unilateral termination of the policy by the insurer. Nor do we find any analogous provision that would render the contractual right a mere expectancy.

community funds have purchased policy renewal rights necessary to keep the insurance in force, may well be appropriate." (*Marriage of Elfmont*, *supra*, 9 Cal.4th at p. 1034.)

In this situation, where the insured spouse becomes uninsurable during a term paid for by the community, the proper apportionment of the proceeds is "between community and separate property in the same ratio that the amount of premiums paid from community earnings bears to the amount of premiums paid from separate property." (*Biltoft*, *supra*, 96 Cal.App.3d at p. 62.)[16]

*Premium Caps*

There is another scenario wherein the separate estate could appropriate the community's contractual rights. Over time, a spouse may remain insurable but become more expensive to insure "because of advancing age or declining health." (*In re Marriage of Gonzalez*, *supra*, 168 Cal.App.3d at p. 1025.)[17] That is why some term insurance policies, like the policy at issue here, provide for a cap on premiums during a particular period of time. With a cap provision, the premium for a particular term may not solely reflect actuarial considerations relative to the insured's likelihood of dying during that term. The price may be "artificially" low in accordance with the premium cap. The cap has value when the premiums would otherwise exceed the maximum it allows.

The cap itself is a contractual right to be charged premiums at or below a maximum amount. Both the separate *and community* estates have paid premiums to

---

[16] To this we would add that the premium-paying spouse should be credited with half of the final premium payment. While the *Biltoft* method addresses the separate and community estates' relative contributions towards the renewal right, there is no recognition of the separate estate's unique contribution to the final coverage term by paying the final premium.

[17] Sometimes, this is referred to as "lessened" insurability. (*Ibid.*) While this diction conflicts with the arguably binary nature of insurability, it is a convenient term and we employ it here.

maintain this contractual right.  Thus, if the insured spouse renews the policy postseparation, and the premiums would have been higher without the premium cap, the insured spouse has necessarily appropriated property which the community acquired and helped maintain.[18]

As noted *ante*, the characterization of the proceeds as separate or community "will depend on the … premium for the final term of the policy."  (*Minnesota Mut. Life Ins. Co.*, *supra*, 174 F.3d at p. 983.)  In the case of lessened insurability, the final premium obligation is met by the joint effect of (1) the funds expended by the separate estate to pay the premium and (2) the "discount" embodied in the premium cap, which is a partial-community asset.  Thus the community should receive a fraction of the proceeds based on two factors:  (1) the community's role in maintaining the contractual right to a premium cap; and (2) the premium cap's role in the separate estate's acquisition of the final term of coverage.  That fraction would be calculated as follows:[19]

$$\frac{\text{(percentage of total premiums paid by community)} \times \text{(effective premium discount for final term of coverage)}}{\text{(actual premium paid for the final term of coverage)} + \text{(effective premium discount for final term of coverage)}}$$

For example, consider the following hypothetical.  The community pays 50 percent of the premiums over the life of a policy.  Without the premium cap, the insured

---

[18] In this situation, the insured spouse is not wholly dependent on the community's contractual rights as in the case of complete uninsurability.  Rather, the insured spouse is appropriating the community's property and thereby receiving what is effectively a discount on premiums.

[19] The numerator is the percentage of premiums paid by the community throughout the life of the policy multiplied by the premium discount the separate estate received by virtue of the premium cap when it purchased the final term of coverage.  The denominator is the entire premium discount received by the separate estate by virtue of the premium cap when it purchased the final term of coverage plus the actual amount paid for the final premium.  The premium discount would likely need to be established by expert testimony.

spouse would have had to pay $1,000 for the premium for the final coverage term. However, because of the premium cap, the insured spouse only had to pay a $400 premium for the final coverage term.

$$\frac{50\% \ x \ \$600}{\$600 + \$400} \quad \longrightarrow \quad \frac{\$300}{\$1,000} \quad \longrightarrow \quad \frac{3}{10}$$

In this scenario, the community would be entitled to three-tenths, or 30 percent, of the proceeds.

*Summary*

In sum, the proper characterization of term life insurance proceeds depends on a number of factors. The proceeds are entirely community when the final premium is paid solely with community property. (*Logan*, *supra*, 191 Cal.App.3d at p. 321.) The proceeds are entirely separate property when: (1) a separate estate has paid the final premium with separate funds; and (2) the insured spouse was insurable at the end of the last term paid for by community funds; and (3) either (a) the insured spouse's health was such that he or she could have purchased a comparable policy at a comparable price when the separate estate began paying the premiums, or (b) the policy did not contain a premium cap when the separate estate began paying the premiums. The proceeds are part community and part separate where (1) the separate estate has paid the final premium with funds that are part community and part separate; or (2) the insured spouse has become medically uninsurable before he or she began paying the premiums with separate property; or (3) the insured spouse could not have purchased a comparable policy at a comparable price when he or she began paying the premiums with separate property. [20] (See appendix A, *post*.)

---

[20] We understand this holding is burdensome. But "the claim of … administrative burden surely cannot serve as support for an inequitable substantive rule …." (*Marriage of Brown*, *supra*, 15 Cal.3d at p. 849.) While we wish a simpler holding were possible, we believe it is compelled by the application of community property principles to the

We cannot apply these principles to the proceeds at issue here because there is an insufficient factual record. To determine which characterization and/or apportionment method applies, there must be findings of fact on (1) whether Gary paid the postseparation premiums with (a) separate funds, (b) funds attributable to his community estate with Becky, or (c) funds attributable to his community estate with Cynthia (or some combination); (2) if Gary paid the premiums with separate funds, whether he was medically insurable when he began doing so; and, if so, (3) whether Gary could have purchased a comparable policy at a comparable price when he began paying premiums with separate funds (and if not, how much more expensive would the premiums have been without the premium cap).

We therefore vacate the order adjudicating the policy proceeds. We remand for the trial court to make these factual findings, and to apply the law as expressed in this opinion to the facts so found.

None of the parties' remaining contentions alter this disposition, as we will now explain in the unpublished portion of the opinion.

III.*

WE CANNOT RESOLVE BECKY'S CLAIM ON CROSS-APPEAL THAT SHE IS ENTITLED TO 100 PERCENT OF THE PROCEEDS AS THE SOLE VALID BENEFICIARY ON THE FACTUAL RECORD BEFORE US

There are a number of contentions that Becky raises on cross-appeal that we cannot address given that we remand for reconsideration of the characterization issue. Becky claims she is entitled to 100 percent of the proceeds because she is the effective beneficiary on the policy. She argues that while Gary purported to change the

---

various iterations of term life policies. Presumably, the Legislature is free to eschew these tenets and provide for a simpler methodology for allocating term life insurance proceeds. Until such a time, existing community property principles must govern.

* See footnote, *ante*, page 1.

24.

beneficiary from Becky to Cynthia, that designation was void because it violated the ATROs.  (See Fam. Code, § 2040.)  She also contends the designation is independently void because it was a fraudulent conveyance.  (See Civ. Code , §§ 3439.04, 3439.07, subd. (a)(1).)  As explained *post*, we cannot determine whether Becky is entitled to 100 percent of the proceeds on these theories.

Under the principles outlined in section II, *ante*, it is possible that Gary and *Cynthia*'s community estate has an interest in the insurance proceeds.  If so, then Cynthia may have a right to some of the proceeds even though Gary's change of beneficiary from Becky to Cynthia was voided by the trial court.  Cynthia's interest in the proceeds "may not be defeated by a gift of the policy proceeds to a third party named as beneficiary" without her consent.  (See *Life Insurance Co. of North America v. Cassidy* (1984) 35 Cal.3d 599, 605.)[21]  "The surviving spouse is therefore entitled to set aside his or her community share in life insurance proceeds even where the decedent spouse designated another person as beneficiary.  [Citations]  This rule applies to term life insurance policies .…"  (*Emard v. Hughes Aircraft Co.* (9th Cir. 1998) 153 F.3d 949, 955-956, abrogated on other grounds by *Egelhoff v. Egelhoff* (2001) 532 U.S. 141.)

Thus, the resolution of Cynthia's claim to 100 percent of the proceeds must await proper characterization of the proceeds.

IV.*

WE CANNOT RESOLVE CYNTHIA'S CLAIM THAT EVEN IF THE PROCEEDS
MUST BE SPLIT, SHE SHOULD RECEIVE HALF

Cynthia claims that even if the trial court properly split the proceeds between Gary and Becky, it should have awarded Gary's share to Cynthia.  We cannot reach this claim

---

[21] On the unusual facts of this case, Becky is the "third party" in that she is not a party to Gary and Cynthia's marriage.

* See footnote, *ante*, page 1.

25.

either. If the proceeds were property of Gary and Cynthia's community estate, then Cynthia herself is entitled to at least a portion of the proceeds. (See Prob. Code, § 100, subd. (a); see also part III, *ante*.) But if the proceeds are entirely property of Gary and Becky's community estate, then Cynthia may not be entitled to the requested relief because the trial court voided the change of beneficiary. Therefore, this issue may need to be considered on remand depending on the ultimate characterization of the proceeds.

We note that the parties, in their opening appellant's briefs, do not challenge the trial court's finding that Gary violated the ATROs, nor its ruling that the change of beneficiary from Becky to Cynthia is void. Those rulings remain intact on remand. The trial court will determine the practical effect of those rulings, if any, once it characterizes the policy proceeds.[22]

## V.*

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY LEAVING BECKY'S CREDITOR CLAIM AGAINST GARY'S ESTATE TO THE PROBATE COURT

As an alternative argument, Becky claims the trial court should have awarded her 100 percent of the proceeds because she was entitled to 50 percent for her portion of the community's interest and 50 percent as a creditor of Gary's estate. The family court did

---

[22] In her reply brief, Cynthia contends Becky is estopped from asserting Gary violated the ATROs because "in her previous litigation conduct, she claimed the term life policy was Gary's separate property." A threshold requirement for the application of collateral estoppel is that "the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) The issue of characterizing the funds used to pay the life insurance premiums is not identical to the issue of whether Gary violated the ATROs in changing the beneficiary on that policy. Collateral estoppel does not apply here. Similarly, estoppel by conduct requires a representation or concealment of material facts " 'to a party ignorant, actually and permissibly, of the truth .…' " (*Hill v. Kaiser Aetna* (1982) 130 Cal.App.3d 188, 195.) There is no evidence that this element was satisfied.

\* See footnote, *ante*, page 1.

26.

award Becky 50 percent as a member of the community, but left it to the probate court to adjudicate Becky's creditor claim. Becky claims it was error for the court not to award her "the balance of the policy to offset [her] existing judgment.…"

First, we note that this particular issue may become moot depending on proceedings following remand. However, if on remand the court again arrives at the conclusion that Becky is entitled to less than all of the proceeds, then this issue will remain relevant. Therefore, we discuss it briefly. (Cf. Code Civ. Proc., § 43.)

Becky's postjudgment motion to adjudicate the life insurance proceeds was brought under Family Code section 2556. That section requires the court to "equally divide" omitted or unadjudicated community assets, "unless the court finds upon good cause shown that the interests of justice require an unequal division of the asset .…" (Fam. Code, § 2556.) Because the trial court equally divided the asset, it necessarily did not find upon good cause shown that the interests of justice require an unequal division of the asset. Instead, the court determined that Becky was entitled to 50 percent of the proceeds. It left the adjudication of Becky's claim to the remainder of the proceeds on a debtor-creditor theory to the probate court. We find no abuse of discretion.

The family court would have likely violated due process if it had simply awarded the proceeds to Becky as a creditor without proper notice to other claimants against Gary's estate. (See *Tulsa Professional Collection Services, Inc. v. Pope* (1988) 485 U.S. 478, 490.) Moreover, Becky provided no evidence to the trial court regarding the priority of her debt vis-à-vis other creditors. (See Prob. Code, § 11420.) It was appropriate for the family court to have the probate court determine the resolution of Becky's claims as a creditor of Gary's estate.

## VI.*

## DISCLOSURE REQUIREMENTS ARE SET BY STATUTE, NOT THE FORMAT OF A JUDICIAL COUNCIL FORM

Cynthia argues that Gary did not improperly fail to disclose the policy during the dissolution proceeding.  She contends that the judicial council form for disclosures (Form No. FL-142), only contemplates disclosure of life insurance policies with a cash surrender value.  And, because the policy had no cash surrender value, Gary's failure to "specify" the term life policy was "consistent" with the form.

Disclosure requirements are set by statute, not by the format of judicial council forms.  (See Fam. Code, §§ 2104, 2105.)  The statutes require disclosure of "all assets in which the declarant has or may have an interest … regardless of the characterization of the asset … as community … *or separate*."  (Fam. Code, § 2104, subd. (c)(1), italics added.)  The format of a judicial council form does not change statutory requirements for a particular filing.  (Cf. *People ex rel. Dept. of Transportation v. Superior Court* (1992) 5 Cal.App.4th 1480, 1484 [" 'Adoption of Official Forms for the most common civil actions has *not* changed the statutory requirement that the complaint contain "*facts* constituting the cause of action" ' "].)

Even if the form's wording had been determinative, Cynthia's argument fails.  At most, the form's language regarding cash surrender value suggested the policy should not be listed in that particular section.  But the form also had a section entitled "Other Assets."  In sum, the form does not prohibit the listing of life insurance policies with no cash surrender value, and the Family Code requires it.  (See Fam. Code, § 2104, subd. (c)(1).)  We see no basis for disturbing the trial court's finding that Gary violated disclosure requirements.

---

\* See footnote, *ante*, page 1.

VII.*

FAMILY CODE SECTION 1101 SANCTIONS

On cross-appeal, Becky contends that she should have been awarded 100 percent of the proceeds due to Gary's failure to disclose. (See Fam. Code, § 1101, subd. (h).) As the court found, Gary failed to disclose the term life policy and thereby violated his fiduciary duty.

When the court finds a breach of fiduciary duty, the remedies "shall include, but not be limited to, an award to the other spouse of 50 percent, or any amount equal to 50 percent, of any asset undisclosed … in breach of the fiduciary duty …." (Fam. Code, § 1101, subd. (g).) When the breach "falls within the ambit of Section 3294 of the Civil Code," the remedies "shall include, but not be limited to, an award to the other spouse of 100 percent, or an amount equal to 100 percent, of any asset undisclosed …." (Fam. Code, § 1101, subd. (h).)

Here, the trial court did find that Gary breached his fiduciary duty by "fail[ing] to disclose the … policy pursuant to Family Code sections 2104 and 2105." However, it awarded only 50 percent of the asset to Becky. Thus, the court impliedly found that Gary's breach did not fall within the ambit of section 3294 of the Civil Code.

We review findings regarding "oppression, fraud, or malice" (Civ. Code, § 3294) under the " 'substantial evidence' " standard of review. (*In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 40.) We review a trial court's implied findings of fact under the substantial evidence test as well. (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 739.)

While Gary failed to disclose the policy on his disclosure declarations, he did state at his deposition: "I think I have a million-dollar policy." Becky contends this "was not

---

*\* See footnote, *ante*, page 1.*

29.

enough" because Gary had a duty to "augment his disclosures and to be strictly transparent." We agree that Gary's deposition testimony did not bring him into compliance with disclosure requirements under the Family Code. (See Fam. Code, §§ 2104, 2105.) But a 100 percent award under subdivision (h) requires finding a breach of fiduciary duty *and oppression, fraud or malice*. (Fam. Code, § 1101, subd. (h); Civ. Code, § 3294, subd. (a).) Gary's deposition testimony is relevant to the latter determination. While Gary's deposition testimony did not preclude the trial court's finding that he had breached his duty of disclosure, it similarly did not preclude the trial court from finding that the same breach was not a result of oppression, fraud or malice. To the contrary, Gary's deposition testimony is substantial evidence supporting that implied finding. Therefore, we will not disturb it on appeal.

## VIII.*

## STATUTE OF LIMITATIONS WAS NOT RAISED BELOW

Cynthia claims Becky's motion to adjudicate the proceeds was barred by the statute of limitations. However, she failed to raise this issue below. It is clear that when a party fails to raise the expiration of the statute of limitations in the trial court, "such a waiver cannot be overcome on appeal even if the undisputed facts demonstrate that a timely challenge would have been meritorious as a matter of law." (*Poster v. Southern Cal. Rapid Transit Dist.* (1990) 52 Cal.3d 266, 273, fn. 3; see also *In re Marriage of Hanley* (1988) 199 Cal.App.3d 1109, 1121.)

## IX.*

## JUDICIAL ESTOPPEL WAS NOT RAISED BELOW

Cynthia claims Becky is judicially estopped from claiming the proceeds are community property. Cynthia did not raise this argument below. "As a general rule,

---

\* See footnote, *ante*, page 1.

\* See footnote, *ante*, page 1.

'issues not raised in the trial court cannot be raised for the first time on appeal.' [Citations.]  On a number of occasions, however, appellate courts have … permitted a party to raise belatedly 'a pure question of law which is presented on undisputed facts.' [Citations.]" (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417.)

"Only when the issue presented involves purely a legal question, on an *uncontroverted record and requires no factual determinations*, is it appropriate to address new theories." (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847 (*Mattco Forge, Inc.*)  Judicial estoppel is not such an issue.  "A trial court's determination on the issue of estoppel is a factual finding ...." (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 850.)  Because the estoppel determination is factual, we cannot address it as a new theory on appeal.  (See *Mattco Forge, Inc.*, *supra*, 17 Cal.App.4th at p. 850.)

While Cynthia styles this argument as judicial estoppel in her opening brief, her counsel raised a similar but distinct contention at oral argument.  She contends that Judge Somers had made an implied finding that the policy was separate property when he purportedly ordered Gary to reimburse Becky for premium payments.  Even if we were to address this contention on its merits, it fails.  The evidence Cynthia cites from the trial before Judge Somers pertains to reimbursements for various premiums paid from 2005 to 2008.  Gary died in April 2010.  As we explained above, the characterization of term life insurance proceeds "will depend on the … premium for the final term of the policy." (*Minnesota Mut. Life Ins. Co.*, *supra*, 174 F.3d at p. 983.)  A threshold requirement for the application of collateral estoppel is that "the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.)  Even if the evidence cited by Cynthia and offered before Judge Somers properly raised the issue of whether the 2005 to 2008 premiums were paid with separate or community funds while Gary was alive, that issue is not

31.

identical to the one relevant here: the proper characterization of the policy's proceeds once Gary died in 2010. Collateral estoppel does not apply.

Moreover, Cynthia's estoppel argument assumes Becky claimed the policy was Gary's separate property before Judge Somers. The record before us is not so clear. Before Judge Somers, Becky acknowledged that Gary was permissibly withdrawing $20,000 from BCI, and giving $10,000 of that sum to her. But, she alleged that Gary began taking out more than the agreed-upon $20,000 per month from BCI. Believing the income generated by BCI was a community asset, Becky asked Judge Somers to reimburse her in connection with the amounts Gary withdrew in excess of the agreed-upon $20,000 per month. Thus, Becky's response to Cynthia's estoppel argument on appeal is that she "made claims for payments made by the business that she believed were of a personal nature and not business related" and when she "*could not identify the payment as business related, she simply included it in her list of items*." (Italics added.)

For example, Becky listed her claims for reimbursement in an exhibit offered before Judge Somers. Under the heading "Excess Amounts Paid to or for the Benefit of Gary J. Burwell from Burwell Concrete During Calendar Year 2007," Becky listed a $10,000 transfer Gary allegedly made on January 8, 2007. Through one of *Gary's* exhibits, it is shown that the $10,000 was credited to an account from which multiple payments were made including a term life policy premium payment. *Becky*'s claim for reimbursement does not list the premium payment as a line item, only the $10,000 transfer which Gary apparently used for many purposes, including paying the premium. On this record, we cannot find the character of policy proceeds was an issue litigated before Judge Somers or that Becky took inconsistent positions vis-à-vis the character of the policy.

32.

## DISPOSITION

The trial court's order that the "term life insurance policy was a community asset of the parties" is vacated.  The matter is remanded for further evidentiary proceedings to determine the proper characterization and distribution of the term life insurance policy proceeds in accordance with this opinion.

_____

Poochigian, Acting P.J.

WE CONCUR:

_____

Franson, J.

_____

Peña, J.

# APPENDIX A

