Filed 6/16/21  Marriage of Pruitt and Burwell CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re Marriage of BECKY BURWELL PRUITT and GARY J. BURWELL. | F076661 |
| BECKY BURWELL PRUITT, | (Kern Super. Ct. No. S1501FL591767) |
| Appellant, | |
| v. | **OPINION** |
| CYNTHIA BURWELL CLARK, | |
| Appellant. | |

-ooOoo-

APPEAL from orders of the Superior Court of Kern County.  Susan M. Gill and Cynthia L. Loo, Judges.

Law Office of Edward J. Thomas, Edward J. Thomas, and Jeffrey A. Davis, for Appellant Becky Burwell Pruitt.

Baghdaserians Law Group, Patrick Baghdaserians and Garrett C. Dailey for Appellant Cynthia Burwell Clark.

-ooOoo-

This appeal arises from a dispute between Gary Burwell's first and second wives (respectively, respondent/cross-appellant Becky (Burwell) Pruitt and appellant/cross-respondent Cynthia (Burwell) Clark). Both parties claim they are entitled to the proceeds of a $1 million term life policy insuring Gary's life. Becky was the original beneficiary of the policy proceeds. A subsequent attempt by Gary to change the beneficiary from Becky to Cynthia was later invalidated by the trial court.

After an original appeal and remand, the trial court determined the final premium on the policy was paid with funds from Gary and Cynthia's community estate. Consequently, the court treated the distribution of the proceeds as being "akin to where a spouse chooses to name a beneficiary other than his/her spouse as the beneficiary" to a community-funded insurance policy. Accordingly, the court awarded half the proceeds to Becky as beneficiary of the policy and half to Cynthia as her community share. Both parties appeal the court's rulings. We affirm.

## FACTS

Gary and Becky married on December 9, 1978, and separated on September 21, 2004. In 1996, a term life insurance policy was purchased (hereafter the "term life policy" or "the policy"). Gary was the named insured and Becky was the named beneficiary until October 7, 2008.

In September 2004, Becky petitioned for dissolution of her marriage with Gary.

*Automatic Temporary Restraining Orders*

Gary was served with a summons along with Becky's petition. The summons contained a number of automatic temporary restraining orders (ATROs). (See Fam.Code, § 2040; Cal. Rules of Court, rule 5.50(b).) The ATROs included the following text:

"Starting immediately, you and your spouse are restrained from: [¶] ... [¶]

"2. cashing, borrowing against, cancelling, transferring, disposing of, or changing the beneficiaries of any insurance or other coverage including life,

2.

health, automobile, and disability held for the benefit of the parties and their minor child or children;

"3. transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life; and

"4. creating a nonprobate transfer or modifying a nonprobate transfer in a manner that affects the disposition of property subject to the transfer, without the written consent of the other party or order of the court. Before revocation of a nonprobate transfer can take effect, or a right of survivorship to property can be eliminated, notice of the change must be filed and served on the other party."

*Further Court Proceedings*

A status-only judgment of dissolution was entered in August 2005, and the court retained jurisdiction over all other issues.

Gary and Becky reached an agreement with regard to the division of their marital property. Their agreement formed the basis of an August 22, 2006, "Stipulated Further Judgment on Reserved Issues."

The parties agreed that a corporation in Gary's name – Burwell Properties, Inc. – would not be subject to disposition in any court proceedings because it was being held for the exclusive benefit of the parties' adult daughters.

Under the parties' stipulated division of assets, Gary was also awarded another corporation: Burwell Concrete, Inc. (BCI).

*Gary Remarries*

In November 2006, Gary married appellant and cross-respondent, Cynthia (Burwell) Clark.

*August 2008 Stipulated Judgment*

In August 2008, Gary and Becky stipulated to a "further" judgment resolving some property issues. Though the stipulated judgment indicates that "the parties have

3.

reached an agreement with regard to the division of their marital property," five issues were explicitly reserved for a trial. One of the issues reserved for trial was "claims for breach of spousal fiduciary duty."

The stipulated judgment, signed by both parties, also states:

"16. *Full Disclosure of Assets and Gifts*. Each party has warranted to the other that he or she has no ownership interest in or claim to any property of any kind, other than the property described in this Further Judgment, and that he or she has not made, without the knowledge of the other, any gift or transfer of community property within the past five years for less than full and adequate consideration.

"17. *After-Discovered And Concealed Assets*. If additional assets of a community property nature are subsequently discovered, the existence of which were in good faith unknown or forgotten by both parties, such assets shall be divided equally between the parties. All other after-discovered assets shall be divided as determined by a court of competent jurisdiction. This court specifically retains jurisdiction over all concealed or after-discovered assets."

The judgment also fixed the separation date at September 21, 2004.

*Change of Beneficiary*

On October 7, 2008, Gary changed the beneficiary on the term life policy from Becky to Cynthia. Gary had not listed the policy in his preliminary or final disclosure declarations in the dissolution action. (See Fam. Code, §§ 2104, 2105.)

*Trial on Reserved Issues*

The trial on reserved issues contemplated by the prior stipulated judgment commenced in June 2009 before Judge John Somers and continued over several months. Several issues were adjudicated at the trial. The most contentious issue involved a community-asset business called Burwell Concrete, Inc. (BCI). The court was tasked with deciding whether approximately $2.5 million in postseparation income from BCI was community income or Gary's separate income. The trial also dealt with claims of breach of fiduciary duty.

4.

The court eventually issued its ruling on May 16, 2011. First, the court ruled that (1) BCI had been awarded to Gary on August 21, 2008, and (2) postseparation income from BCI prior to August 21, 2008, was community income.

The court then ruled on the breach of fiduciary duty claims as follows:

"[T]he court does not find a breach of fiduciary obligation in this case. There is no evidence that petitioner failed to meet her obligations of disclosure, or of good faith and fair dealing, in any way. Respondent's [(i.e., Gary's) ] conduct is more problematic. Despite counsel's best efforts, there were often significant delays or problems in the disclosure of relevant financial information.... The disclosure issues, while problematic, are not sufficient in the court's view to establish breach of a fiduciary obligation in this case."

The court also ruled that Gary owed Becky (1) $105,195.49 in "back [spousal] support payments and interest"; (2) $125,000 in attorney fees; (3) $1,524,531 in reimbursements and credits for Becky's portion of community property less $44,283.14 in Gary's reimbursements; and (4) $95,102 in previously ordered equalization payments. As a result, the court ordered that "Respondent and his estate" owed Becky $1,805,545.35" by November 12, 2011. The parties refer to this as "Becky's $1.8 million judgment," and we will do the same.

*Gary's Suicide and Becky's Civil and Probate Actions*

On April 17, 2010, after trial had commenced, but before the court had issued its aforementioned ruling, Gary committed suicide. Shortly after Gary's death, Becky filed a civil action to prevent the term life policy's proceeds from going to Cynthia. Becky also filed a probate action seeking letters of administration for Gary's estate.

Becky moved to consolidate the civil action with the dissolution proceeding. Cynthia opposed consolidation. In her opposition papers, Cynthia argued that there were "no remaining issues left to be determined in the family law matter." Her opposition papers further stated that she "is not a party to the action nor does she have any real

5.

interest in the outcome." The court denied the motion to consolidate, but ordered the civil action stayed.

*Becky's Motion Regarding the Insurance Policy*

Concurrent with her motion to consolidate, Becky filed a motion seeking adjudication of the insurance policy as an omitted asset. (See Fam. Code, § 2556.) Becky contended that she was entitled to 100 percent of the proceeds. She acknowledged that she was aware of the policy when it was purchased but assumed Gary had let it lapse.

Becky argued she was entitled to the proceeds under three legal theories. First, Gary's purported change of beneficiary from Becky to Cynthia was void because it was made in violation of the ATROs. As a result, Becky was still the operative beneficiary under the policy. Second, Gary's failure to disclose the insurance policy in his disclosures violated Family Code section 1101, and therefore the proceeds should be awarded entirely to Becky under subdivision (h) of that section. Third, the court retained jurisdiction over omitted community property assets under the August 2008 stipulated judgment. She argued she was entitled to half the proceeds as her share of the community asset. She also claimed the other half of the proceeds because they exceeded the amount of debt Gary owed her. These included amounts Gary allegedly owed her under the August 2008 stipulated judgment and "anticipated amounts [Gary] will owe [Becky] once Judge Somers makes his ruling [after the trial on reserved issues]." Becky subsequently filed a "Supplemental Memorandum of Points and Authorities" raising a fourth theory of recovery. In that filing, Becky argued that Gary's purported change of beneficiary must be set aside as a fraudulent transfer under section 3439.04 of the Civil Code.

Cynthia filed briefing in opposition to the motion, and her counsel appeared at oral argument. She contended that the policy was Gary's separate property. She also argued that, to the extent the ATROs apply to separate property, they conflict with Family Code

6.

section 2010. Cynthia contended that section 2010 provides that "the court has no jurisdiction over a spouse['s] separate property."

*Court's November 9, 2011, Order*

Judge Susan M. Gill ruled on the motion in an order dated November 9, 2011. The court found that Gary failed to disclose the policy and thereby violated his fiduciary duty to Becky. As a result, the policy was deemed an omitted asset and was "neither distributed in the Judgment on Reserved Issues, nor included in Judge Somers' ruling of April 1, 2010." Therefore, the ATROs continued to apply to the asset, and Gary's change of beneficiary to Cynthia "is void."

The court ruled that the policy was a community asset. The ruling contained no analysis of the characterization issue but did cite to *Estate of Logan* (1987) 191 Cal.App.3d 319, 326 (*Logan*) and *In re Marriage of Gonzalez* (1985) 168 Cal.App.3d 1021, 1024–1026.

The court ordered one-half of the $1 million proceeds distributed to Becky "as her share of this community property asset." The court ordered that the remaining half of the proceeds "shall become part of [Gary's] estate." The order notes that Becky is a creditor of the estate, "and the Probate Court must resolve the issue of what priority to give [Becky's] creditor claims against [Gary's] estate."

*Burwell I*

Both Cynthia and Becky cross-appealed the trial court's November 9, 2011, order. In a partially published decision filed October 31, 2013, this court vacated the trial court's ruling that the term life insurance policy was a community asset. (*In re Marriage of Burwell* (2013) 221 Cal.App.4th 1 (*Burwell I*).)

We held that "the characterization of the proceeds 'will depend on the … premium for the final term of the policy.' (*Minnesota Mutual Life Insurance Co.*[ *v. Ensley* (9th Cir. 1999) 174 F.3d 977], 983.)" (*Burwell I, supra*, 221 Cal.App.4th at p. 17, fn. omitted.) Specifically, proceeds are to be characterized as follows:

"The proceeds are entirely community when the final premium is paid solely with community property. (*Logan*, *supra*, 191 Cal.App.3d at p. 321.) The proceeds are entirely separate property when (1) a separate estate has paid the final premium with separate funds; (2) the insured spouse was insurable at the end of the last term paid for by community funds; and (3) either (a) the insured spouse's health was such that he or she could have purchased a comparable policy at a comparable price when the separate estate began paying the premiums, or (b) the policy did not contain a premium cap when the separate estate began paying the premiums. The proceeds are part community and part separate where (1) the separate estate has paid the final premium with funds that are part community and part separate; or (2) the insured spouse has become medically uninsurable before he or she began paying the premiums with separate property; or (3) the insured spouse could not have purchased a comparable policy at a comparable price when he or she began paying the premiums with separate property. [Citation.]" (*Id*. at p. 24, fn. omitted.)

We concluded that these principles could not be applied until a sufficient factual record was developed. (*Burwell I*, *supra*, 221 Cal.App.4th at p. 24.) We remanded for the trial court to make findings as to the source of funds used to pay for the final term of coverage, and issues of medical and/or lessened insurability. (*Id*. at pp. 24–25.)

In the unpublished portion of the opinion, we observed that the parties did not challenge on appeal the trial court's finding that Gary violated the ATROs. Nor had the parties challenged the trial court's ruling that the change of beneficiary from Becky to Cynthia is void. Accordingly, we held that "[t]hose rulings remain intact on remand." (*Burwell I*, *supra*, F064265, slip op. at p. 26 [nonpub. portion].)

*Remand Proceedings*

First Stipulation

On March 4, 2015, the court filed an order pursuant to an agreement of the parties. Specifically, the parties entered a stipulation as to certain facts, with the intent that they be "conclusively" presumed true for all future trials or hearings. Among those facts is the following: "There are very few assets in Gary's probate estate, and there are clearly insufficient assets to pay Becky's $1.8 [m]illion [j]udgment."

8.

Second Stipulation

In July 2016, the parties entered into a second stipulation. Among the stipulated facts were the following:

"2. The One Million Dollar Policy was a term life insurance policy, the monthly premium on which was $186.62. The last $186.62 premium paid on the One Million Dollar Policy prior to Gary's death was paid by electronic transfer on April 7, 2010, from a United Security Bank checking account held in the joint names of Cynthia and Gary (herein 'Cynthia's and Gary's Joint Account').

"3. On March 16, 2010, Cynthia's and Gary's Joint Account was overdrawn. There were no funds in the account. Two deposits were made into Cynthia's [a]nd Gary's Joint Account between March 16, 2010 (the date the account was overdrawn), and April 7, 2010 (the date the last $186.62 premium payment was made from the account on the One Million Dollar Policy prior to Gary's death). The two deposits were (i) a $2,300 telephone transfer credit on March 17, 2010, and (ii) a $3,000 check deposited on March 24, 2010."

*Hearings*

The court heard "opening statements" from counsel on July 14, 2016.[1] Across several hearings, the court received testimony.[2] The parties also provided multiple briefs

[1] The parties interpreted *Burwell I* as holding that each new premium payment creates a new insurance policy. However, in *Burwell I*, we expressly held that "each premium payment does *not* create a new contract." (*Burwell I*, *supra*, 221 Cal.App.4th at p. 19, italics added.)

Instead, each new premium payment gives rise to "a new enforceable contractual right and thus a distinct property interest." (*Burwell I*, *supra*, 221 Cal.App.4th at p. 19.) It is important to remember that the property to be classified is not "the policy" as a unitary asset, but rather "[t]he chose in action *represented* by the policy …." (*New York Life Ins. Co. v. Bank of Italy* (1923) 60 Cal.App. 602, 606, italics added.) The premise that property interests inhere at the level of contractual rights rather than a contract as a whole, is not of our making. (See, e.g., Civ. Code, §§ 14, subd. (b)(3), 953; see also *In re Marriage of Brown* (1976) 15 Cal.3d 838, 845.)

[2] Some testimony concerned the issues of lessened insurability and comparable policy pricing. (See *Burwell I*, *supra*, 221 Cal.App.4th at pp. 20–23.) The court ultimately found that Gary was insurable when he began paying premiums and could have purchased a comparable policy at a comparable price when he began paying the

to the trial court on various issues related to the disposition of the proceeds, including briefing after the presentation of evidence.

### Testimony of Cynthia

Cynthia testified that she and Gary were married from November 2006 until he died on April 17, 2010. In 2010, both she and Gary worked for BCI. Cynthia would "take the calls" for BCI, and Gary would manage the operation and work in the field.

Cynthia testified that the purpose of her joint bank account with Gary was to pay "household bills" and "living expenses." Gary and Cynthia had been paying the premium on the insurance policy via automatic debit out of the joint account since September 2009, give or take a couple months. Accordingly, the $168.62 premium payment on April 7, 2010, was made by automatic debit out of the joint account. Cynthia understood that she was the beneficiary on the policy at that time.

Cynthia and Gary's joint account was overdrawn in early 2010. From that time until Gary's death, there were only two deposits into the joint account, both coming from BCI.[3] As a result, the funds used to make the final premium in April 2010 were necessarily funds that ultimately came from BCI. Cynthia identified a $3,000 deposit into the joint account on March 24 as a "draw[]" that Gary took from BCI. Cynthia also identified a $2,300 transfer credit on March 17 as having come from BCI.[4]

Counsel also read portions of Cynthia's deposition testimony into the record. Among the matters read into the record was Cynthia's testimony that she did not remember working outside the home after 2006. Cynthia also testified in deposition that

---

premiums with separate property. Neither party challenges those findings, so we do not recount the testimony/evidence relating thereto.

[3] Similarly, in deposition testimony admitted at trial, Cynthia testified that from January 1 until the date of his death, the only source of money Gary had was BCI or Burwell Properties.

[4] Contextually, it is clear that both March dates described herein were in 2010.

the only source of money for Gary from January 1st to the date of his death was from either BCI or Burwell Properties.

Testimony of Adam Harston

Adam Harston testified as an expert on behalf of Becky. Harston testified that he was retained to determine the source and character of the funds used to pay the final premium payment on the life insurance policy. Harston reviewed several documents including the parties' factual stipulations, a judgment signed by Judge Somers, the insurance policy, premium notices, BCI's corporate tax returns from 2007 through 2010, Gary's personal tax returns from 2007 through 2010, an income tax refund check, and statements for three bank accounts: BCI's account at Westamerica Bank (Westamerica); BCI's account at United Security; and Gary and Cynthia's account at United Security.

Harston testified that premium payments on the life insurance policy became delinquent after August 2009.

In August or October 2009, BCI's Westamerica account was closed and its funds transferred to BCI's account at United Security. Gary also closed a personal account he had at Westamerica and opened an account at United Security with Cynthia in November 2009. It was from Gary and Cynthia's account at United Security ("Gary and Cynthia's account") that the final premium payment was made.

In Harston's opinion, the funds drawn from Gary and Cynthia's account to pay the final premium were community property of Gary and *Becky*'s community. Harston explained his reasoning as follows. Harston initially testified that he assumed the 2007 income tax refund to BCI was community property because it came to BCI prior to the 2008 judgment awarding BCI to Gary. Harston later testified that though the tax refund pertained to tax year 2007, the refund check itself was not received until November 2008, which is after Judge Somers awarded BCI to Gary as his separate property. On redirect examination, Harston testified that Judge Somers's 2008 judgment reserved the issue of whether BCI's income prior to 2008 was community or separate property. In 2010,

11.

Judge Somers ruled that the money earned by BCI prior to 2008 was community property of Gary and Becky.

The tax refund was deposited into BCI's account at Westamerica. The balance on that account never fell below $1,800 before the account was closed, and its funds transferred to United Security. Hartson assumed that any "separate property expenses" of Gary's would have come from Gary's "separate property funds, not from the community funds of Gary and Becky that were left." Harston assumed that, in order to avoid violating his fiduciary duties to Cynthia, Gary paid the insurance premiums with "community property money of him and Becky."

A transfer of $17,000 from BCI's Westamerica account to BCI's United Security Bank account occurred in November 2009. In Harston's opinion, $1,800 of that sum was community property of Gary and Becky, and the remainder of the $17,000 was Gary's separate property. Harston arrived at the $1,800 figure because it was the lowest balance the Westamerica account reached from the time the tax refund was deposited until the account was closed.

Shortly before the last premium payment was made, Cynthia and Gary's personal account was overdrawn. A transfer into the personal account from BCI's United Security account rectified the overdrawn status. In Harston's opinion, some of the funds used for that transfer were the community property of Becky and Gary.

Harston considered whether any funds deposited into Gary and Cynthia's account could have come from community property funds of Gary and Cynthia. Harston concluded that "no wages or anything" were recorded on BCI's or Gary's 2010 income tax return that would indicate he had received any community income that could be deposited into the account.

*September 7, 2017, Minute Order*

In a minute order dated September 7, 2017, Commissioner Cynthia Loo entered her ruling. The ruling observed that Probate Code section 5305 establishes a presumption

that the funds in the joint account were Gary and Cynthia's community property. The court concluded that Becky failed to carry her burden of rebutting this presumption. As a result, the final premium payment for the insurance policy was paid with community property.

The court found that Gary remained insurable at all relevant times and could have purchased a comparable policy at a comparable price when he began paying premiums.

The court further observed that *Burwell I* left intact the trial court's prior ruling that Gary's change of beneficiary from Becky to Cynthia was void. As a result, the court concluded that the present situation was similar to one where a spouse names a nonspouse as the beneficiary of a policy paid for with community funds. On that basis, the court granted 50 percent of the proceeds to Becky and 50 percent of the proceeds to Cynthia.

The body of the order concludes with a directive that "Petitioner shall prepare an order for signature by the Court." Above Commissioner Loo's signature appears the text, "IT IS SO ORDERED."

Cynthia appealed this order via a notice of appeal filed November 3, 2017.

*November 27, 2018, Order*

On November 27, 2018, a Findings and Order After Hearing signed by Judge Susan Gill was filed. This order largely tracked the findings and orders from Commissioner Loo's September 7, 2017 order with two notable exceptions. First, the November 27, 2018, order contains no directive about preparation of a future order. Second, the November 27, 2018, has an additional substantive sentence that reads: "Section 910(a) of the California Family Code is inapplicable, and Gary's and Cynthia's community property interest in the One Million Dollars is not liable for satisfying any portion of Gary's $1.8 million dollar judgment in favor of Becky."

Becky appealed this order via cross-appeal filed January 10, 2019.

## DISCUSSION

### I.    Cynthia's Motion to Dismiss is Denied

Cynthia moved to dismiss Becky's cross-appeal as untimely.  We deferred ruling on the motion pending a decision on the merits.

In her motion, Cynthia argues the September 7, 2017, order was "the appealable order in this case," not the November 27, 2018, order.  If Cynthia is correct, Becky's time to cross-appeal from the September 7, 2017, order, would have only been extended "until 20 days after the superior court clerk serve[d] notification of the first appeal."  (Cal Rules of Court, rule 8.108(g)(1).)  Under that timeframe, Becky's cross-appeal filed on January 10, 2019, would be untimely.

In response, Becky argues the September 7, 2017, order was not appealable at all. Thus, Becky contends that she properly cross-appealed from the November 2018 order. If Becky is correct, then her January 2019 cross-appeal from an order entered November 2018 would be timely.

Consequently, it is clear that the resolution of Cynthia's motion to dismiss hinges on which of the orders were appealable.

Cynthia emphasizes the fact that the November 2018 order is largely a restatement of the findings and orders contained in the September 2017 order.  And, indeed, it is true that "[o]nce a final, appealable order or judgment has been entered, the time to appeal begins to run.  The Rules of Court do not provide, once a judgment or appealable order has been entered, that the time to appeal can be restarted or extended by the filing of a subsequent judgment or appealable order making the same decision."  (*Laraway v. Pasadena Unified School Dist.* (2002) 98 Cal.App.4th 579, 583.)

However, while orders made after final judgments are generally appealable (Code Civ. Proc., § 904.1, subd. (a)(2)), "[s]ome postjudgment orders are not appealable because, '… [they] are more accurately understood as being preliminary to a later judgment ….' " (*In re Marriage of Ellis* (2002) 101 Cal.App.4th 400, 403.)  For present

14.

purposes, the most important example of this is when a minute order directs preparation of a further order or judgment. Such a minute order is "merely a preliminary order authorizing a subsequent judgment and [is] not appealable. [Citations.]" (*Brown v. Municipal Court* (1978) 86 Cal.App.3d 357, 360, fn. 1; see also *Grattan v. Silbaugh* (1953) 121 Cal.App.2d 684; 9 Witkin (2020) Cal. Proc. 5th Appeal, § 613.) " 'No appeal lies from a minute order, … the clear intent of which is that the court has merely authorized the issuance of another written order or judgment.' [Citations.]" (*Fox v. Fox* (1954) 127 Cal.App.2d 253, 254–255.)

Here, the September 2017 minute order clearly directed petitioner to prepare a further written order for signature by the court. Under the authorities cited above, this anticipation of a further order renders the September 2017 minute order unappealable.[5] Therefore, the appealable order in this case was the November 2018 order. Becky timely cross-appealed from that order. For these reasons, we deny Cynthia's motion to dismiss Becky's cross-appeal.

## II. Cynthia May not Challenge the Trial Court's Order Declaring the Change of Beneficiary Void Pursuant to the ATROs

As noted above and in *Burwell I*, Judge Susan Gill issued an order dated November 9, 2011, declaring that the ATROs continued to apply to the term life insurance policy when the purported beneficiary change from Becky to Cynthia was made. As a result, the order held that the "change of beneficiary from [Becky] to Cynthia Burwell is void." The same order proceeded to declare that the term life insurance policy was a community asset of the parties (i.e., Becky and Gary).

---

[5] While this conclusion warrants denial of Cynthia's motion to dismiss Becky's cross-appeal, it does not require dismissal of Cynthia's appeal from the September 2017 order. "[O]n a purported appeal from a nonappealable order, the appellate court has discretion to treat the appeal as a petition for an extraordinary writ within the appellate court's original jurisdiction. [Citation.]" (*In re Marriage of Ellis*, *supra*, 101 Cal.App.4th at p. 404.)

15.

Cynthia appealed from this order and challenged its characterization of the life insurance policy proceeds.  (*Burwell I*, *supra*, 221 Cal.App.4th at p. 11.)  However, Cynthia's opening brief in *Burwell I*, did *not* "challenge the trial court's finding that Gary violated the ATROs, nor its ruling that the change of beneficiary from Becky to Cynthia is void."  As a result, we held that because they were not challenged on appeal, those particular rulings "remain intact on remand."  We explained the trial court would have to determine any practical effect of those rulings after it characterized the policy proceeds on remand.

Cynthia now attempts to challenge the conclusions that the ATROs were still in effect when Gary purported to change the beneficiary on the insurance policy and that, as a result, the beneficiary change is void.[6]  These challenges are not cognizable.

"As a general rule, all questions presented by the record must be raised upon the *first* appeal from an adverse ruling, ..."  (*Allen v. California Mut. Building & Loan Ass'n* (1943) 22 Cal.2d 474, 485, italics added.)  Thus, when the factual predicates for an appellate contention are present when the first appeal is taken and yet appellant fails to raise the contention, it cannot then be asserted in a subsequent appeal.  (*People v. Senior* (1995) 33 Cal.App.4th 531, 538.)  In such circumstances, the appellant does not get " ' "two bites at the appellate apple" ' [citation], …" (*Ibid*.)  Put differently, the doctrine of forfeiture "precludes successive appeals based on issues ripe for consideration in the prior appeal and not brought in that proceeding.  [Citations.]" (*People v. Jordan* (2018) 21 Cal.App.5th 1136, 1143.)

---

[6] Cynthia also challenges the September 2017 minute order as internally inconsistent.  However, we review the ruling, not the reasoning.  For the reasons explained herein, the ruling that Becky and Cynthia are each entitled to half the proceeds was correct.  Therefore, we need not determine whether all of the trial court's own reasoning was correct or internally consistent.

These principles preclude Cynthia's present attack on the trial court's conclusions regarding the applicability of the ATROs and their effect of invalidating the beneficiary change. She contends that the validity of the court's November 9, 2011, order depends on whether the policy was an asset of Gary and Becky's community, and we "now know" it was not.[7] Even if the applicability of the ATRO did depend on the characterization of the policy, Cynthia was free to challenge the order on that basis in the prior appeal. Specifically, she was free to argue that because the policy was separate property (see *Logan*, *supra*, 191 Cal.App.3d at p. 326), the ATROs did not apply.[8] She failed to do so and cannot do so now.

---

[7] However, the ATROs are not limited to community property. (See Fam. Code, § 2040, subd. (a)(2)(A), (a)(3).) The statutory ATROs generally restrain "both parties from transferring … or in *any way disposing of*, *any property*, *real or personal*, whether community, quasi-community, *or separate* …." (Fam. Code, § 2040, subd. (a)(2)(A), italics added.) The statutory ATROs also specifically restrain "both parties from … canceling, transferring, disposing of, or changing the beneficiaries of insurance … including life … held for the benefit of the parties and their child or children…." (Fam. Code, § 2040, subd. (a)(3).)

There is a split of authority as to whether term life insurance policies have any value while the insured is alive. (Compare *In re Marriage of Lorenz* (1983) 146 Cal.App.3d 464, 468, with *In re Marriage of Gonzalez*, *supra*, 168 Cal.App.3d at pp. 1024–1025.) Those that conclude a term life insurance policy has no value until the death of the insured might believe the ATROs are overly broad to the extent they prohibit changing the beneficiary designations on such policies. However, if Gary believed the reach of the ATROs extended too broadly in his situation, he could have applied for a modification of the ATRO to permit his change of beneficiary to Cynthia. (Fam. Code, § 235.) He did not do so, and we cannot ignore the failure to abide by a restraining order.

[8] Cynthia argues the "finding Gary violated the ATROs and the beneficiary change was impermissible" was reversed by *Burwell I*. Not so. We quite clearly noted in *Burwell I* that the parties had not "challenge[d] the trial court's finding that Gary violated the ATROs, nor its ruling that the change of beneficiary from Becky to Cynthia is void" and that, as a result, "[t]hose rulings remain intact on remand." (*Burwell I*, *supra*, F064265, slip op. at p. 26 [nonpub. portion].)

17.

## III. The Court had Jurisdiction to Determine Title to the Proceeds

Cynthia argues the trial court has no jurisdiction to determine who is entitled to the insurance proceeds because they were not an asset of the marital community at issue.[9] We conclude the court had jurisdiction.

It is true that a family court presiding over a marital dissolution action does not generally have jurisdiction to dispose of separate property. The family court may characterize assets, confirm separate property and, if permitted by statute, order reimbursement from the separate estate to the community estate. (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 810.) Generally, that is the full extent of a family court's jurisdiction over separate property in a marriage dissolution action. (*Ibid*.) However, superior courts have general jurisdiction to determine title to property. Thus, *if the parties to a dissolution action make the determination of title to property an issue in the proceedings*, the superior court has jurisdiction to determine that question as "fully as if the title were put in issue in a direct action brought for that purpose." (*Porter v. Superior Court* (1977) 73 Cal.App.3d 793, 804–805 & fn. 4.)

Here, the parties have made the core issue of this case to be the determination of title to the insurance proceeds. They "presented such property as an important issue and invited the trial court to make disposition thereof." (*Spahn v. Spahn* (1945) 70 Cal.App.2d 791, 796.) As a result, the trial court was fully empowered to resolve all applicable legal or equitable claims to determine title.[10] (Cf. *Porter v. Superior Court*,

---

[9] Cynthia relies on an appellate opinion that was subsequently ordered depublished.

[10]     Cynthia observes that Becky's motion seeking the insurance proceeds was brought under Family Code section 2556, which concerns division of an undivided community asset. Cynthia then poses a rhetorical question in her brief: How can an undivided asset motion divide an asset which is not community property?

As noted above, we have concluded the court had jurisdiction to determine who was entitled to the proceeds even though they are not an asset of Gary and Becky's community estate. To the extent Cynthia is arguing that a motion under Family Code

*supra*, 73 Cal.App.3d at pp. 804–805; see also *Spahn v. Spahn*, *supra*, 70 Cal.App.2d at pp. 795–797.)

## IV. Becky's Evidentiary Challenge to the Trial Court's Finding Regarding the Final Premium Payment Fails

Becky contends there is "no evidence" to support the trial court's finding that the final premium payment on the policy was paid with community funds of Gary and Cynthia. Becky does acknowledge that the payment was made from an account in Gary and Cynthia's names. She further acknowledges that fact creates a presumption the funds used were their community property. (See Prob. Code, § 5305, subd. (a).)

However, she argues that she successfully rebutted the presumption arising from Probate Code section 5305 subdivision (a) by proving, through expert testimony, that the funds could be traced to separate property. (See Prob. Code, § 5305, subd. (b).) It is important to observe that this is a different contention than asserting there is *no* evidence to support the trial court's finding. In actuality, Becky is asserting that the trial court should have made the favorable inferences supported by her evidence (e.g., expert testimony regarding tracing) over the unfavorable inferences raised by Cynthia's evidence (e.g., the stipulated fact that premium was paid from joint account).[11] This contention does not satisfy the requirements of a substantial evidence challenge. That is, even if we accepted that Becky successfully presented evidence raising an inference that the premium payment was made with separate property, we would reject her challenge. Because the court's conclusion is supported by its own substantial evidence, it is immaterial that some testimony supports a conclusion contrary to that reached by the trier

---

section 2556 was the wrong procedural vehicle by which to seek characterization or disposition of the insurance proceeds, we find no prejudice. Cynthia was on notice of the nature of Becky's claim and engaged her on the merits.

[11] Indeed, Becky later concedes that the stipulation the funds came from a joint account "presumptively met [Cynthia's] initial burden" of proof.

of fact.  (*In re Estate of Durham* (1951) 108 Cal.App.2d 148, 150–151; *Martinez v. Hudson* (1936) 14 Cal.App.2d 42, 43–44.)[12]

## V. Gary's Testamentary Disposition of the Policy Proceeds is Effective as to his Community Share, but Invalid as to Cynthia's Community Share

The trial court's ruling stated:  "This Court is treating the situation akin to where a spouse chooses to name a beneficiary other than his/her spouse as the beneficiary, and uses community funds to do so."  This was the correct approach, for the reasons explained below.

### A.   *Law*

"[W]here premiums on the life insurance policy of the husband are paid out of community funds, the proceeds become community assets."[13]  (*Beemer v. Roher* (1934) 137 Cal.App. 293, 297.)  Because it is a community asset, "[a] husband … has a right to give away his one-half of the community property [citation] .…"  (*Mazman v. Brown* (1936) 12 Cal.App.2d 272, 274.)  And he may do so through a "gift to take effect upon his death as by way of an insurance policy."  (*Ibid*.)  Often, this is accomplished by designating a beneficiary to the life insurance policy.  In this circumstance, the designation of a beneficiary "is testamentary in character."  (*Tyre v. Aetna Life Ins. Co.* (1960) 54 Cal.2d 399, 404.)

Specifically, " 'the designation of a beneficiary in a policy of life insurance initiates in favor of the beneficiary an inchoate gift of the proceeds of the policy, which, if not revoked, by the insured prior to his death, vests in the beneficiary at the time of his

---

[12] Becky argues in her reply brief that because she "traced" the funds to a separate property source, it "once again" became Cynthia's burden to prove the funds used to make the final premium payment were community funds of Cynthia and Gary.  But that assumes the trial court was required to credit Becky's expert tracing evidence, which is incorrect.

[13] We retain the gendered language of older cases when it aligns with the facts of the present case.  Of course, the same principles apply if a wife owns a policy, and the husband is the beneficiary.

death; …' " (*Mazman v. Brown*, *supra*, 12 Cal.App.2d at p. 274; see also *New York Life Ins. Co. v. Bank of Italy*, *supra*, 60 Cal.App. at p. 606.)  Thus, the "gift" is made *when the beneficiary is designated*.  However, the gift is usually revocable and therefore does not "vest" in the beneficiary until *the time of death*.

For these reasons, it is clear that a spouse can exert some testamentary control over life insurance proceeds.  However, "[l]ife insurance proceeds are subject to the general rule that a spouse cannot dispose of community personal property without either the other spouse's written consent or consideration.  [Citation.]" (*In re Marriage of O'Connell* (1992) 8 Cal.App.4th 565, 578; see also *Martinez v. Hudson*, *supra*, 14 Cal.App.2d at p. 44.)  Consequently, when the proceeds are community property, "the husband has the power to give his half of the community property to the named beneficiary, *but not the wife's half*.  [Citation.]" (*Patillo v. Norris* (1976) 65 Cal.App.3d 209, 217, italics added.)

As a result, when a beneficiary designation would otherwise vest *all* of the proceeds in a third party, a surviving spouse that did not consent to the designation "may recover his or her community share in the proceeds.  [Citations.]" (*Life Insurance Co. of North America v. Cassidy* (1984) 35 Cal.3d 599, 605–606; see also *Minnesota Mutual Life Insurance Co. v. Ensley*, *supra*, 174 F.3d at p. 985; *Tyre v. Aetna Life Ins. Co.*, *supra*, 54 Cal.2d at p. 405; *In re Marriage of O'Connell*, *supra*, 8 Cal.App.4th at p. 578; *McBride v. McBride* (1936) 11 Cal.App.2d 521, 524.) Usually, this means the beneficiary is entitled to one-half of the proceeds "as a gift by the husband of his share of such community assets" and the surviving spouse is entitled to the other half.  (*Beemer v. Roher*, *supra*, 137 Cal.App. at p. 297.)  In other words, a "gift by the husband of community property in excess of 50 per cent does not invalidate the entire disposition, but is invalid … as to the excess …." (*Mazman v. Brown*, *supra*, 12 Cal.App.2d at p. 276; see also *McBride v. McBride*, at pp. 523–524)

21.

**B.** *Analysis*

The aforementioned principles dictate the result here. When Gary designated Becky as the beneficiary of the policy in 1996, he initiated an "inchoate gift of the proceeds of the policy." (*Mazman v. Brown*, *supra*, 12 Cal.App.2d at p. 274.) Unless the designation was revoked, Becky's right to the proceeds would "vest" at the time of Gary's death. (*Ibid*.) Though Gary attempted to revoke the gift by changing the beneficiary to Cynthia, that purported revocation was ruled invalid and said ruling cannot now be challenged. As a result, the gift vested in Becky at the time of Gary's death.

However, as noted above, the insurance proceeds were the community property of Gary and Cynthia. Consequently, while Gary's testamentary disposition of the proceeds would otherwise have vested 100 percent of the proceeds in Becky, that disposition is "invalid … as to the excess" (*Mazman v. Brown*, *supra*, 12 Cal.App.2d at p. 276) of Gary's 50 percent community share. As a result, Cynthia "is entitled to set aside the gift made to the named beneficiary without consideration and without her consent, to the extent of one-half of the community property interest. [Citations.]" (*Patillo v. Norris*, *supra*, 65 Cal.App.3d at p. 217.) That is, Becky is entitled to half the proceeds pursuant to the testamentary disposition of Gary's community share, and Cynthia is entitled to the other half as her own community share. (See *Beemer v. Roher*, *supra*, 137 Cal.App. at p. 297.)

**C.** ***Fact that Gary Lacked "Donative Intent" by the Time of His Death is Irrelevant Here***

Becky seeks to avoid this result by arguing there was no evidence Gary had a "donative intent." Similarly, Cynthia asserts Gary "never made a gift" to Becky. Not so. Gary clearly *did* intend to gift the proceeds to Becky at one point: in 1996 when he initially designated her as beneficiary during their marriage. It was at that moment Gary intentionally "initiate[d] in favor of [Becky] an inchoate gift of the proceeds of the policy." (*Mazman v. Brown*, *supra*, 12 Cal.App.2d at p. 274.)

22.

It is true that this gift would not "vest" until Gary's death, and was subject to revocation during Gary's lifetime. And indeed, it is clear that Gary's intent did subsequently change. But, importantly, his attempt to revoke the gift was invalidated pursuant to the ATROs.

Thus, the proper conceptualization of the present situation is that Gary *did* make an inchoate gift to Becky and then tried to revoke the gift at a time when he was restrained from doing so. As a result, the gift vested in Becky upon his death in accordance with the intent he had when the inchoate gift was originally made, but in contravention of the intent he likely had at death.[14] Gary was not *forced* to *make* an "involuntary gift," he was *prevented* from *revoking* a voluntary gift.

### D. Sufficient Evidence Supported Implied Finding Cynthia did not Consent to Disposition of Proceeds to Becky

Becky next suggests that Cynthia failed to prove she did not consent to the testamentary disposition of the proceeds entirely to her (Becky). However, the change of beneficiary form designating Cynthia as beneficiary contained a paragraph beginning with the sentence: "I (we) as the policyowner(s) hereby consent to the above designations and *revoke all previous beneficiary designations….*" (Italics added.) Below this paragraph appears Cynthia's signature (as well as Gary's). The "previous beneficiary designation[]" being revoked was the one in favor of Becky. Cynthia's signature below the above-quoted statement clearly supports an inference she did not consent to Becky receiving the proceeds. Because that inference supports the trial court's order, we accept it.[15]

---

[14] It is important to remember the trial court invalidated Gary's attempted revocation of the gift not because it did not reflect his intent at the time, but because it was purportedly made in violation of the ATROs.

[15] As a result of our conclusions in this case, we do not address the parties' untimely contentions concerning Probate Code section 5021.

## VI. Fact that Gary Died Intestate Does Not Entitle Cynthia to 100 Percent of the Proceeds

Cynthia claims she is nonetheless entitled to 100 percent of the proceeds. Specifically, that she is entitled to her half of the community proceeds (Prob. Code, § 100, subd. (a)) *and* Gary's half of the community proceeds because he died intestate (Prob. Code, §§ 6401, subd. (a), 13500.)  But this argument ignores the fact that Gary's designation of Becky as the beneficiary of the policy remains in effect under the trial court's November 9, 2011, order.  Gary's interest in the proceeds goes to Becky by operation of the original beneficiary designation, not to Cynthia as successor.[16]  (See *In re Welfer* (1952) 110 Cal.App.2d 262, 265 ["a beneficiary under an insurance policy takes by virtue of the contract of insurance … the proceeds do not become a part of the estate of the insured …"]; see also Prob. Code, § 5000.)

## VII. Becky has not Sufficiently Developed her Claim of Error Regarding Family Code Section 910

Becky next contends the court erred in concluding Family Code section 910 does not apply here.  That statute establishes the general rule that a community estate is liable

---

[16] Because the court properly awarded 50 percent of the proceeds to Becky pursuant to the beneficiary designation, we need not resolve whether that award is also supported by the court's finding that Gary's failed to disclose the policy (see Fam. Code, § 1101.)  We do note that if Gary had timely disclosed the policy, the parties could have included its disposition in the 2008 stipulated judgment dividing their marital assets. At that point, they presumably would have had several options, including assigning a value to the policy and awarding it to one party with an offset to the other party. Or, they might have agreed the policy had no value at that time. Alternatively, they might have even entered an agreement whereby Gary would be required to maintain the policy for Becky's benefit. (See *Burgart v. Burgart* (1970) 5 Cal.App.3d 409.)

As noted in *Burwell I*, the court impliedly found previously that Gary had not acted with malice, oppression, fraud or malice so as to support a 100 percent award under Family Code section 1101, subdivision (h). (*Burwell I*, *supra*, F064265, slip op. at p. 30 [nonpub. portion].)

Nor need we resolve whether Family Code section 1101 even applies to the proceeds at issue here.

for debts incurred by either spouse before or during marriage.  (Fam. Code, § 910, subd. (a).)

Becky's opening brief offers little argument to support her claim.  She quotes the statute and a case, while observing the trial court provided no reasoning for rejecting her claim.  However, she does not sufficiently develop her claim, nor address the provision in the policy that states, "The policy proceeds will be exempt from the claims of creditors and from legal process to the extent the law permits."  (See Ins. Code, § 10171.)

"We are not bound to develop appellants' arguments for them.  [Citation.]"  (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)  Therefore, we reject this claim of error because it is not "sufficiently developed."  (*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1440, fn. 12.)

## DISPOSITION

The court's orders are affirmed.  Each party shall bear their own costs on appeal.


POOCHIGIAN, Acting P.J.


WE CONCUR:


FRANSON, J.


PEÑA, J.